## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JAMES LOGAN, SR., on behalf of himself and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES RAILROAD RETIREMENT BOARD,<br><br>    Defendant. | Civil Action No. 4:25:cv-00238-O |

## AMENDED COMPLAINT – CLASS ACTION

Railroad retirees[1] have long been subjected to an unauthorized tax on the portion of their Tier II retirement benefits funded by their after-tax payroll contributions. The collective impact of this unauthorized tax amounts to millions of dollars. Railroad retirees are entitled to recover these contributions *in full* by treating a portion of their Tier II benefits as nontaxable. But the Railroad Retirement Board (the "Board") doesn't clearly or effectively tell them that.

In fact, the Board stands to benefit from keeping retirees in the dark. While the Board has all the information needed to tell retirees the taxable amount of their Tier II benefits, it knowingly fails to do so. The unauthorized revenue the Board collects from

---

[1] The term "railroad retiree" refers to any former railroad worker receiving benefits pursuant to the Railroad Retirement Act, including retirees who were employed in railroad labor positions and management positions.

this scheme is transferred to the Board's Railroad Retirement Account. Instead of staying in retirees' pockets where it belongs, the Board uses that money to pay benefits or invests it to grow the Board's assets. Railroad retirees are unwittingly financing the railroad retirement system to a degree Congress never authorized, and the Board is failing to fulfill its fundamental fiduciary duties—acting in retirees' best interests instead of its own and making sure retirees get and keep the correct benefit amount.

Plaintiffs seek declaratory and injunctive relief, as well as restitution. Going forward, the Board should not grow its assets and subsidize the Railroad Retirement Account with money belonging to the people it serves. The Board should be required to (i) tell retirees that not all of their Tier II benefits are taxable and that figuring out the taxable amount requires calculation; and (ii) report the taxable amount or clearly state that taxability has not been determined, either on the front of Form RRB-1099-R or through some other direct communication. Until that happens, railroad retirees will continue to collectively lose millions of dollars of the safety net they labored for years to earn and which the Board is charged with ensuring they receive.

## Parties

1.      Plaintiff James Logan, Sr., resides in Parker County, Texas. He is a railroad retiree receiving Tier II benefits under the Railroad Retirement Act.

2.      Defendant United States Railroad Retirement Board is an independent federal agency in the Executive Branch charged with administering the Railroad Retirement Act. The Board's headquarters is located at 844 North Rush Street,

Chicago, Illinois 60611; it maintains a field office in this District at 819 Taylor Street, Fort Worth, Texas 76102.

## Jurisdiction and Venue

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 702, and 28 U.S.C. § 1346(a)(2) ("Little Tucker Act").

4.      The government has waived sovereign immunity under 5 U.S.C. § 702 and, alternatively, under the Little Tucker Act.

5.      Plaintiff James Logan, Sr.'s individual claims against the Board, as well as the claims of each proposed class member, do not exceed $10,000.

6.      This action is for declaratory and equitable relief authorized by 28 U.S.C. § 2201 *et seq.* Plaintiff seek injunctive and declaratory relief, as well as restitution.

7.      The Board's members—Erhard R. Chorlé, John Bragg, and Thomas R. Jayne—are responsible for compliance with any mandatory or injunctive decree.

8.      This Court has jurisdiction over the parties.

9.      Venue is proper under 28 U.S.C. § 1391(e) because Plaintiff James Logan, Sr., resides in this District.

## Facts

**A.      Congress created the Railroad Retirement Board during the Great Depression to provide financial security for railroad workers, retirees, and their families.**

10.     Before the Board was established in 1935, railroad retirees received retirement benefits from private industrial railroad pension plans. The Great

Depression of the early 1930s revealed significant defects in these plans. At that time, private railroad pension plans were unable to meet the needs of railroad workers and retirees due to deteriorating employment conditions and the accumulation of older railroad workers in the industry.

11.    These private railroad pension plans paid inadequate benefits, had limited provisions for disability retirement, and did not allow credits to be freely transferred from employer to employer. The plans were inadequately financed, and employers could terminate them at will at any time.

12.    In the mid-1930s, the national Social Security system was still in its planning stage, and Social Security benefits would not be available until January 1940. Additionally, the Social Security system would not give credit for service performed before 1937. However, conditions in the railroad industry necessitated immediate benefits payments based on prior service. Railroad workers sought a retirement system separate from the Social Security system that would broaden existing railroad retirement programs under a uniform national plan.

13.    In 1934, Congress established a unified national railroad retirement system, taking into account the circumstances of the railroad industry amid the Great Depression.

14.    The Railroad Retirement Act of 1934 established the Railroad Retirement Board, a federal agency that administers retirement, survivor, unemployment, and sickness benefits for U.S. railroad workers and their families.

**B.      The Board owes railroad retirees fiduciary duties.**

15.      Today, the Board derives its statutory authority from the Railroad Retirement Act of 1974 and the Railroad Unemployment Insurance Act. The Board has full responsibility for administering the Railroad Retirement Act.

16.      Three Presidentially appointed members compose the Board:

(i)      a member recommended by railroad labor organizations;

(ii)      a member recommended by railroad employers; and

(iii)      the Chairman, who represents the public interest.

Board members serve five-year terms.

17.      The Railroad Retirement Act's statutory scheme is designed to protect railroad retirees and gives rise to the Board's fiduciary duties, which the Board has expressly accepted and undertaken. The Board is responsible for administering the Act for the benefit of the railroad community. Retirees rely on this trust relationship with the Board to ensure they get—and keep—all the benefits Congress provided for them.

18.      In its Performance Accountability Reports, the Board acknowledges "its fiduciary responsibilities to the rail community," stating "The RRB is committed to fulfilling its fiduciary responsibilities to the rail community." [2] The Board developed

---

[2] *Railroad Retirement Board Performance and Accountability Report*, RR. RET. BD. (Fiscal Year 2024), at 13, 15, https://www.rrb.gov/sites/default/files/2024-11/PAR2024_0.pdf (last accessed June 18, 2025) ("2024 Account. Rep.");
*Railroad Retirement Board Performance and Accountability Report*, RR. RET. BD. (Fiscal Year 2023), at 13, 15, https://www.rrb.gov/sites/default/files/2023-11/PAR2023.pdf (last accessed June 18, 2025) ("2023 Account. Rep.");

strategic objectives to facilitate achieving those fiduciary responsibilities, which include:

- Ensuring that trust fund assets are protected, collected, recorded, and reported appropriately.

- Ensuring the accuracy and integrity of benefit programs.

- Ensuring the effectiveness, efficiency, and security of operations.

- Effectively carrying out responsibilities with respect to the NRRIT.[3]

The Board also states, "As part of our fiduciary responsibilities to the rail community, we must ensure that the correct benefit amounts are being paid to the right people." [4]

## C.    Railroad retirees receive two types of benefits—one equivalent to Social Security (Tier I) and another treated like a private pension (Tier II).

19.    The railroad retirement system is separate from the Social Security system and is comprised of two tiers: Tier I and Tier II.

20.    Tier I benefits are generally equivalent to what a railroad retiree would have received under Social Security (Social Security equivalent benefits, or "SSEB").

21.    Tier II benefits, which are based on railroad service, are comprised of benefit amounts beyond what a retiree would have received under Social Security (non-Social Security equivalent benefits, or "NSSEB").

---

*Railroad Retirement Board Performance and Accountability Report*, RR. RET. BD. (Fiscal Year 2022), at 13, 15, 22, https://www.rrb.gov/sites/default/files/2022-11/par2022_0.pdf (last accessed June 18, 2025) ("2022 Account. Rep.").

[3] The NRRIT is the National Railroad Retirement Investment Trust. The sole purpose of the NRRIT is to manage and invest railroad retirement assets. It has no powers or authority over the administration of railroad retirement benefits, and it is subject to enforcement actions by the Railroad Retirement Board.

[4] 2024 Account. Rep., at 22; 2023 Account. Rep., at 22; 2022 Account. Rep., at 22.

22.     From 1974 to 1981, Tier II benefits were financed solely by a railroad worker's employer.

23.     Since 1981, in addition to employer contributions, railroad workers have been required to contribute after-tax payroll dollars into the Tier II retirement system—these after-tax contributions are mandatory.

24.     Tier I benefits are taxed in the same way as Social Security benefits.

25.     Tier II benefits are taxed differently—they are taxed like qualified private pension plans pursuant to the Railroad Retirement Solvency Act of 1983 and Section 72 of the Internal Revenue Code.

26.     Because Tier I and Tier II benefits are taxed differently, railroad retirees receive two different informational tax returns from the Board each year—one for Tier I SSEB benefits, and the other for Tier II and NSSEB benefits.

| Tier I Benefits | Tier II Benefits |
|---|---|
| Equivalent to Social Security benefits | Benefits are based on railroad service |
| Funded by statutory deductions | Funded by mandatory after-tax payroll contributions |
| Taxed like Social Security benefits | Taxed like qualified private pension plans |
| Retiree receives Form 1099-R informational tax return from the Board | Retiree receives Form RRB-1099-R informational tax return from the Board |

27.     According to the Board's 2024 Annual Report, revenues raised from taxes on Tier II benefits are returned to the Board: "Revenue derived from taxing regular railroad retirement payments in excess of Social Security equivalent benefits is

transferred to the RR Account."[5] The Board invests tax revenues exceeding obligatory

benefits and administrative costs; in fiscal year 2024, the return was 18.90%.[6]

28.     Neither the Railroad Retirement Act nor any other law authorizes the

Board to finance the railroad retirement program or grow the Board's assets using

taxes collected on the portion of Tier II benefits representing employee contributions.

**D.    The portion of a railroad retiree's Tier II benefits representing mandatory after-tax payroll contributions to the Tier II system is not taxable.**

29.     From 1981 to 1983, a railroad retiree's Tier II benefits were tax exempt.

30.     Since 1984, a railroad retiree's Tier II benefits are taxable *except* for the

amount representing the retiree's after-tax payroll contributions into the Tier II system.

31.     In the Railroad Retirement Act, Congress clearly stated that Tier II

benefits are not subject to any tax beyond what is provided for in the Internal Revenue

Code "under any circumstances whatsoever":

> Except as provided in subsection (b) of this section and the Internal Revenue Code of 1986, notwithstanding any other law of the United States, or of any State, territory, or the District of Columbia, no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process *under any circumstances whatsoever*, nor shall the payment thereof be anticipated.

45 U.S.C. § 231m(a) ("Assignability; exemption from levy") (emphasis added).

---

[5] *United States Railroad Retirement Board 2024 Annual Report*, RR. RET. BD., at 9 under "Federal Income Tax Transfers," https://rrb.gov/sites/default/files/2024-09/2024_Annual_Report.pdf (last accessed June 16, 2025).

[6] 45 U.S.C. § 231n(k); *NRRIT Annual Management Report for Fiscal Year 2024*, NAT'L RR. RET. INV. TR., at Introductory Statement, https://rrb.gov/sites/default/files/2025-03/NRRIT_Annual_Management_Report_FY2024.pdf (last accessed June 16, 2025).

32.    According to its plain language, Congress intended 45 U.S.C. § 231m to strongly protect benefits from legal process and unauthorized taxes, even after benefits are paid. *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583-84, 586 (1979) ("Section 231m plays a most important role in the statutory scheme . . . it ensures that the benefits actually reach the beneficiary . . . Section 231m goes far beyond garnishment.").

33.    Taxes on Tier II benefits are calculated pursuant to Section 72 of the Internal Revenue Code; that section provides that such annuities are only taxed to the extent they represent income. Since the retiree's investment in Tier II is not income, it is not taxable under the Internal Revenue Code—and Section 231m(a) of the Railroad Retirement Act expressly prohibits taxing it *under any circumstances whatsoever.*

## E.    The Board subjects Tier II beneficiaries to an unauthorized tax each year, violating its fiduciary duties and 45 U.S.C. § 231m(a).

34.    Before Congress enacted the Tax Reform Act of 1986, railroad retirees did not pay any tax on their Tier II benefits until they had fully recovered their payroll contributions into the Tier II system.[7] Until the Board had paid out the employee's total contribution, there was no taxable amount for a retiree to report. Once the retiree recouped his or her contributions, all Tier II benefits were fully taxable and there was

---

[7] *The Taxation of Railroad Retirement Act Annuities*, RR. RET. BD., at 4, https://www.rrb.gov/sites/default/files/2023-04/TXB-85%20%2803-23%29.pdf (last accessed June 16, 2025) ("The EEC recovery under the Three-Year Rule covers annuitants with annuity beginning dates **before** July 2, 1986. Under the Three-Year Rule, NSSEB and Tier 2 payments became fully taxable only after the total of these benefits paid to all annuitants on the employee's wage record **equaled** the EEC amount.") (emphasis in original).

no longer any nontaxable amount left.

35.     Unlike the current tax scheme applicable to Plaintiffs, retirees covered under the old scheme never had to use a complex calculation to determine their tax liability by breaking up the Tier II benefit into taxable and nontaxable amounts.

36.     For annuities starting after July 2, 1986, to report the correct taxable amount of Tier II benefits, a complex formula must be used because the nontaxable employee contribution is distributed over the life of the annuity instead of being immediately recouped upon retirement.

37.     The Board does not tell railroad retirees what portion of their Tier II benefits are taxable, nor does it directly or effectively communicate to them that they should not report all their Tier II benefits as income.

38.     Each tax year, the Board sends railroad retirees two informational returns: (1) Form 1099-R for the retiree's Tier I benefits and (2) Form RRB-1099-R for the retiree's Tier II benefits. Below is the front of Form RRB-1099-R:

| PAYER'S NAME, STREET ADDRESS, CITY, STATE, AND ZIP CODE | 20XX | ANNUITIES OR PENSIONS BY THE RAILROAD RETIREMENT BOARD | |
|---|---|---|---|
| UNITED STATES RAILROAD RETIREMENT BOARD 844 N RUSH ST CHICAGO IL 60611-2092 | 3. Employee Contributions | | |
| PAYER'S FEDERAL IDENTIFYING NO. 36-3314600 | | | |
| 1. Claim Number and Payee Code | 4. Contributory Amount Paid | COPY B - | |
| 2. Recipient's Identification Number | 5. Vested Dual Benefit | REPORT THIS INCOME ON YOUR FEDERAL TAX RETURN. IF THIS FORM SHOWS FEDERAL INCOME TAX WITHHELD IN BOX 9 ATTACH THIS COPY TO YOUR RETURN. | |
| Recipient's Name, Street Address, City, State, and Zip Code | 6. Supplemental Annuity | | |
| | 7. Total Gross Paid (Sum of boxes 4, 5 and 6) | | |
| | 8. Repayments | | |
| | 9. Federal Income Tax Withheld | THIS INFORMATION IS BEING FURNISHED TO THE INTERNAL REVENUE SERVICE. | |
| | 10. Rate of Tax | 11. Country | 12. Medicare Premium Total |

**FORM RRB-1099-R**

39.     Box 3 of Form RRB-1099-R (Employee Contributions) represents the retiree's total after-tax payroll contributions into the Tier II retirement system. With few exceptions, this amount remains the same each year.

40.     Box 4 (Contributory Amount Paid) represents the gross amount of Tier II benefits paid in that tax year. This amount is partially taxable—it is taxable except for the portion representing the retiree's after-tax payroll contributions into the Tier II system. Form RRB-1099-R does not report to the retiree which portion of this amount is taxable.

41.     Boxes 5 (Vested Dual Benefit) and 6 (Supplemental Annuity) represent other NSSEB amounts paid in that tax year. These amounts are fully taxable.

42.     Unlike the other boxes, Boxes 7 and 9 are prominent and highlighted.

43.     Box 7 (Total Gross Paid) represents the total gross NSSEB benefit paid in that tax year; it includes the Contributory Amount Paid, the gross amount of vested dual benefit payments, and the gross amount of supplemental annuity payments.

44.     Box 9 (Federal Income Tax Withheld) represents the total amount of federal income tax withheld from a retiree's NSSEB benefits.

45.     Nothing on the front of Form RRB-1099-R directly communicates to a retiree which portion of their Tier II/NSSEB benefits was taxable for that tax year, nor whether taxability has been determined or not.

46.     In fact, within a large box on Copy B of Form RRB-1099-R—in all capital letters and large font—the Board instructs retirees to report "this income," even

11

though the Board knows all the reported income is not fully taxable:



47.    By not effectively communicating that the highlighted Total Gross Paid amount is not fully taxable and is not the amount that should be reported, the Board fails to prevent retirees from reporting the entire amount as taxable income, resulting in a net benefit less than the Board is required to ensure the retiree receives.

48.    Railroad retirees rely on the accuracy of Form RRB-1099-R when preparing their taxes. That is especially so where, as here, Copy B of the Form directs them to "**REPORT THIS INCOME ON YOUR FEDERAL TAX RETURN.**" It further cautions "**THIS INFORMATION IS BEING FURNISHED TO THE INTERNAL REVENUE SERVICE.**"

49.    While the small fine print on the back of the form refers to "nontaxable" or "partially" taxable amounts listed in other non-highlighted boxes, it does not directly, clearly, or otherwise effectively tell a retiree that the highlighted Total Gross Paid amount in Box 7 is not the amount that should be reported on his or her

tax return, nor does it explain how to calculate the taxable amount.[8]

50.    The fine print explaining highlighted Box 7 is one sentence:

**Box 7** – Total Gross Paid – (Sum of Boxes 4, 5, and 6) – **This amount represents the total pension paid in 2024.**[9]

Of all the boxes on Form RRB-1099-R containing dollar amounts, the explanation for highlighted Box 7 is the shortest; it does not mention anything about taxability, does not direct the taxpayer to do anything, and does not alert the taxpayer that anything needs to be done before reporting the amount listed.

51.    Understanding the relevant tax scheme and calculations, including how to determine the taxable amount of Tier II benefits, is outside the ordinary railroad retiree's scope of knowledge. A railroad retiree would have to expend considerable time and effort studying multiple IRS publications (which are not legally binding) to attempt to unravel the applicable tax scheme and complex calculations.

52.    The Board has all the information needed to report the taxable amount and to tell retirees they do not owe taxes on the entire amount listed in the Total Gross Paid box. Despite that, the Board does not directly provide that information, whether on Form RRB-1099-R or through some other direct communication.

**F.    As a result of the Board's actions, Plaintiff James Logan, Sr. was subjected to an unauthorized tax on his Tier II benefits in violation of 45 U.S.C. § 231m(a) and the Board's fiduciary duties.**

53.    Plaintiff Logan is a railroad retiree receiving Tier II benefits. He retired

---

[8] *See* **Exhibit B**, at "Explanation of Items on Form RRB-1099-R" (emphasis in original).
[9] *See id.*, at "Box 7" within the section "Explanation of Items on Form RRB-1099-R."

13

in 2018 after 47 years of railroad service. During those 47 years, he contributed a total of $96,635—after taxes—into the Tier II system. Congress explicitly prohibits any tax on the portion of Mr. Logan's Tier II benefits attributable to those contributions.

54.    Plaintiff Logan hires a tax preparer to prepare his taxes each year. She is an enrolled agent with the Internal Revenue Service with over 20 years of accounting experience and has prepared Mr. Logan's taxes for over ten years.

55.    Each year, Plaintiff Logan provides his informational returns to his tax preparer, including the Form RRB-1099-R the Board mails to him.

56.    Until mid-summer 2024, Plaintiff Logan and his tax preparer assumed the entire Total Gross Paid was taxable. Unlike other 1099-R forms sent to qualified pension plan beneficiaries, the front of Form RRB-1099-R does not indicate that only a portion of the income listed is taxable or that taxability has not been determined.

57.    For example, for tax year 2023, the Board sent Mr. Logan the Form RRB-1099-R shown below, directing him to report "this income" and prominently highlighting the Total Gross Paid amount of $31,204.68 (Box 7):



| PAYER'S NAME, STREET ADDRESS, CITY, STATE, AND ZIP CODE UNITED STATES RAILROAD RETIREMENT BOARD 844 N RUSH ST CHICAGO IL 60611-1275 | 2023 | | ANNUITIES OR PENSIONS BY THE RAILROAD RETIREMENT BOARD |
| PAYER'S FEDERAL IDENTIFYING NO. 36-3314600 | 3. Employee Contributions | 96,635.74 | |
| 1. Claim Number and Payee Code | 4. Contributory Amount Paid | 30,688.68 | COPY B- |
| 2. Recipient's Identification Number | 5. Vested Dual Benefit | | REPORT THIS INCOME ON YOUR FEDERAL TAX RETURN. IF THIS FORM |
| Recipient's Name, Street Address, City, State, and Zip Code JAMES LOGAN | 6. Supplemental Annuity | 516.00 | SHOWS FEDERAL INCOME TAX WITHHELD IN BOX 9 ATTACH THIS COPY TO YOUR RETURN. |
| | 7. Total Gross Paid (Sum of boxes 4, 5 and 6) | 31,204.68 | |
| | 8. Repayments | -0- | THIS INFORMATION IS BEING FURNISHED TO THE INTERNAL REVENUE SERVICE. |
| | 9. Federal Income Tax Withheld | 5,580.00 | |
| | 10. Medicare Premium Total | | |
| FORM RRB-1099-R | | | |

58.    Until mid-summer 2024, neither Plaintiff Logan nor his tax preparer knew he was entitled to recover his payroll contributions to the Tier II system—$96,635—over the life of his annuity and therefore a portion of his Tier II benefits is not taxable.

59.    The fine print on the back of Form RRB-1099-R is convoluted, unhelpful, and does not effectively communicate that the Total Gross Paid amount is not fully taxable. The explanation for the Total Gross Paid amount is silent on taxability and does not inform the taxpayer that anything further needs to be done before reporting the Total Gross Paid to the IRS.

60.    By law, Mr. Logan's after-tax contributions are not taxable "under any circumstances."[10]

61.    On a system-wide level, due to the Board's actions, the class of railroad retirees receiving Tier II benefits has been unlawfully taxed each year on amounts representing their after-tax payroll contributions into the Tier II system. As a result, for years, railroad retirees have not been receiving the correct benefit amounts.

62.    By failing to directly, effectively, or clearly communicate to retirees that they are entitled to recover their employee contributions—nearly $100,000 in Mr. Logan's case—the Board fails as a fiduciary to ensure they receive the correct benefit.

63.    The Board spends or invests unauthorized tax revenue collected from retirees for its own benefit in violation of 45 U.S.C. § 231m(a) and its fiduciary duties, enriching its assets with money belonging to retirees and preventing them from

---

[10] *See* 45 U.S.C. § 231m(a).

investing that money or using it for retirement expenses. Despite the fact that the Railroad Retirement Act protects benefits after receipt, the Board is incentivized to grow its own assets instead of ensuring retirees keep every penny of their benefits.

64.    Even if a retiree manages to figure out the tax scheme and requests a refund from the IRS for the overpaid amount, the retiree can only potentially recover up to three years' worth of overpayments despite the fact that the Board kept the retiree in the dark for *more than* three years about his or her legal right to that money.[11]

65.    The Board's harm to Plaintiffs is an ongoing problem.

**G.    For over 20 years, a federal agency administering similar retirement programs has reported the taxable amount of benefits to its retirees.**

66.    The Office of Personnel Management ("OPM") is a federal agency that administers retirement benefits for federal employees, retirees, and their families. It administers benefits under two retirement programs—the Civil Service Retirement System and the Federal Employees' Retirement System.

67.    Currently, there are more than 2,500,000 annuitants under OPM's management; by contrast, the Board manages less than 500,000 annuitants.

68.    Like retirees who receive Tier II benefits under the Railroad Retirement Act, some federal retirees who receive benefits through OPM are entitled to a tax-free recovery of their contributions into the retirement system.

---

[11] *See* 26 U.S.C. § 6511(a) ("Limitations on credit or refund"). Notably, the statute provides for "credit or refund of an overpayment of any tax imposed by this title." However, the unauthorized tax collected from Plaintiffs was not a tax imposed by the Internal Revenue Code—no statute imposed such a tax.

69.     Before 1999, OPM did not report the taxable portion of retirement

benefits on Form CSA 1099R (Statement of Annuity Paid). Instead, it reported only

the gross annuity, leaving the retiree to calculate the annuity's taxable portion.

70.     In approximately 1999, the United States General Accounting Office

("GAO") worked with OPM to determine "(1) what reasons, if any, exist for the

Office of Personnel Management (OPM) to report the taxable portion of annuity

benefits for newly retired federal employees on the Form CSA 1099R (Statement of

Annuity Paid) and (2) the feasibility of OPM's doing so." [12]

71.     After its review, the GAO reported three reasons OPM should report

the taxable portion of annuities on Form CSA 1099R:

> *First*, the task of calculating this portion can be burdensome from the
> retirees' perspective. *Second*, the complexity of the requirement could
> result in retirees' miscalculating the taxable portion of their annuity for
> income tax purposes. *Finally*, reporting the taxable portion of the annuity
> on Form CSA 1099R would allow the Internal Revenue Service (IRS) to
> use it for computer matching purposes. Computer matching of
> information and tax returns is one way that IRS verifies a taxpayer's
> income to determine the proper tax owed.[13]

72.     OPM determined it could easily program a formula to calculate the

taxable amount for retirees using the Simplified Method calculation.[14] It made a

---

[12] Ltr. from GAO to Hon. Amo Houghton, Chairman, Subcommittee on Oversight,
Committee on Ways & Means, House of Representatives, "Determining the Taxable
Portion of Federal Pension Distributions" (May 3, 1999) ("**Exhibit A**"), at 1.
[13] *Id.* at 1 (emphasis added).
[14] The Simplified Method is a complex calculation described by the Internal Revenue
Service in its Publication 575 to determine the taxable portions of annuity payments.
The Simplified Method can be used to determine the taxable portion of a railroad
retiree's Tier II benefits if he or she began receiving benefits after November 18, 1996.

commitment to report the taxable amount to retirees on their annual earnings statements, report the tax-free amount to new retirees in a personalized booklet, and create an online calculator for retirees to use to calculate their tax-free benefits.

73.    OPM stated it was "pleased to offer this valuable service . . . With these several efforts, we believe there will be little room for confusion for our customers on this otherwise complicated subject."[15]

74.    All OPM-administered annuities starting after November 18, 1996, required retirees to use the Simplified Method calculation to determine the taxable portion of their retirement benefits.

75.    Since tax year 2000—a quarter of a century ago—OPM has included a "Taxable Annuity" box on Form CSA 1099R, and it has reported the taxable amount each year to retirees who retired after November 18, 1996. As shown by OPM's letter to the GAO, OPM understood that directly communicating this information to retirees in multiple ways served the best interests of its beneficiaries.[16]

76.    Plaintiff Logan's tax preparer also prepares tax returns for clients who retired from federal civil service and receive benefits through OPM. To prepare their taxes, she references the taxable amount clearly written on Form CSA 1099R.

**H.    It is standard practice to include the taxable amount, or to indicate taxability has not been determined, on the front of 1099-R forms.**

77.    OPM is not the only entity that directly tells retirees either the taxable

---

[15] *Id.* at 6.
[16] *Id.*

amount or the fact that taxability has not been determined—it is a standard practice.

78.    Below is the front of the IRS's standard Form 1099-R:



83.    Form 1099-R clearly distinguishes between the total gross distribution

and the taxable amount of that distribution.

84.    If there is no taxable amount in Box 2a, a checkmark will appear next to

section 2b to clearly and unambiguously tell the taxpayer that the taxable amount has

not yet been determined.

85.    The IRS instructs entities furnishing Form 1099-R to recipients to

"make every effort to compute the taxable amount."[17]

_____

[17] *Instructions for Forms 1099-R and 5498*, INT. REV. SERV., at 13,
https://www.irs.gov/pub/irs-pdf/i1099r.pdf (last accessed June 16, 2025).

## FIRST CLAIM
### (Breach of Fiduciary Duty)

86.     The Railroad Retirement Act is a statutory scheme designed to ensure railroad retirees get, and keep, the retirement benefits provided for by Congress; this statutory scheme gives rise to the Board's fiduciary duties to railroad retirees.

87.     The Board has expressly acknowledged it owes Plaintiffs fiduciary duties in its Performance Accountability Reports. It admits it has a duty to operate effectively and to ensure retirees receive the correct benefit amount.

88.     According to its plain and unambiguous language, Congress intended 45 U.S.C. § 231m to strongly protect railroad retirees' benefits from legal process and unauthorized taxes, including after benefits are paid to retirees. *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583-84, 586 (1979) ("Section 231m plays a most important role in the statutory scheme . . . it ensures that the benefits actually reach the beneficiary . . . Section 231m goes far beyond garnishment.").

89.     As a fiduciary, the Board must conform to the fiduciary standards it expressly accepted, as well as its fiduciary duties arising from the Railroad Retirement Act's statutory scheme.

90.     Under the Railroad Retirement Act, the Board lacks legal authority to collect, withhold, or retain, or to cause the collection, withholding, or retention of amounts representing the nontaxable portion of Plaintiffs' Tier II benefits.

91.     The Board has chosen not to directly, effectively, or clearly communicate to Plaintiffs (i) that they do not owe taxes on the full amount of the

Total Gross Paid reported on Form RRB-1099-R, (ii) the taxable amount of the Total

Gross Paid, and (iii) whether taxability has been determined on the Total Gross Paid.

92.    The Board's actions have adversely affected and aggrieved Plaintiffs.

93.    The Board has acted, and continues to act, in its own interest and to

Plaintiffs' detriment by retaining, spending, and/or investing unauthorized tax revenue

at Plaintiffs' expense. Because of the Board's actions, Plaintiffs' benefits have been

taken from them in violation of 45 U.S.C. § 231m(a), and that money is not available

for them to invest or to use to pay for their own expenses during retirement.

94.    As a result, the Board violated, or caused the violation of, 45 U.S.C. §

231m(a), and breached its fiduciary duties to Plaintiffs, by causing the collection,

withholding, or retention of amounts representing the nontaxable portion of Plaintiffs'

Tier II benefits. In doing so, the Board—Plaintiffs' fiduciary—was unjustly enriched at

Plaintiffs' expense.

## SECOND CLAIM
### (Unlawful Agency Action)

95.    The Railroad Retirement Act is a statutory scheme designed to ensure

railroad retirees get, and keep, the retirement benefits provided for by Congress; this

statutory scheme gives rise to the Board's fiduciary duties to railroad retirees.

96.    The Board has expressly acknowledged it owes Plaintiffs fiduciary duties

in its Performance Accountability Reports. It admits it has a duty to operate effectively

and to ensure retirees receive the correct benefit amount.

97.    According to its plain and unambiguous language, Congress intended 45

U.S.C. § 231m to strongly protect railroad retirees' benefits from legal process and unauthorized taxes, including after benefits are paid to retirees. *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583-84, 586 (1979) ("Section 231m plays a most important role in the statutory scheme . . . it ensures that the benefits actually reach the beneficiary . . . Section 231m goes far beyond garnishment.").

98.     As a fiduciary, the Board must conform to the fiduciary standards it expressly accepted, as well as its fiduciary duties arising from the Railroad Retirement Act's statutory scheme.

99.     Under the Railroad Retirement Act, the Board lacks legal authority to collect, withhold, or retain, or to cause the collection, withholding, or retention of, amounts representing the nontaxable portion of Plaintiffs' Tier II benefits.

100.     The Board has chosen not to directly, effectively, or clearly communicate to Plaintiffs (i) that they do not owe taxes on the full amount of the Total Gross Paid reported on Form RRB-1099-R, (ii) the taxable amount of the Total Gross Paid, and (iii) whether taxability has been determined on the Total Gross Paid.

101.     The Board's actions have adversely affected and aggrieved Plaintiffs.

102.     The Board has acted, and continues to act, in its own interest and to Plaintiffs' detriment by retaining, spending, and/or investing unauthorized tax revenue at Plaintiffs' expense. Because of the Board's actions, Plaintiffs' benefits have been taken from them in violation of 45 U.S.C. § 231m(a), and that money is not available for them to invest or to use to pay for their own expenses during retirement.

103.    As a result, the Board violated, or caused the violation of, 45 U.S.C. §
231m(a), and breached its fiduciary duties to Plaintiffs, by causing the collection,
withholding, or retention of amounts representing the nontaxable portion of Plaintiffs'
Tier II benefits. In doing so, the Board—Plaintiffs' fiduciary—was unjustly enriched at
Plaintiffs expense.

104.    The Board's actions are reviewable under the fiduciary standards the
Board expressly accepted, the Railroad Retirement Act's statutory scheme, and trust
and fiduciary principles.

105.    The Board's actions have adversely affected and aggrieved Plaintiffs by
depriving them of benefits to which they are statutorily entitled. Additionally, because
Plaintiffs did not know about the Board's violations for years, they lost their legal right
to request a refund to recover unauthorized taxes collected more than three years ago.

106.    Plaintiffs do not seek compensatory or substitute damages.

**THIRD CLAIM**
**(Permanent Injunction)**

107.    Plaintiffs seek a permanent injunction requiring the Board to directly,
clearly, and effectively communicate to railroad retirees that the Total Gross Paid
amount on Form RRB-1099-R is not fully taxable and that further calculations are
necessary to determine the taxable amount. Additionally, the Board should be required
to report to each retiree the taxable amount of his or her Tier II benefits or to
otherwise clearly state on the front of Form RRB-1099-R or through some other direct
communication that taxability of the Total Gross Paid amount has not yet been

determined.

108.    Due to the Board's ongoing breaches of fiduciary duty and violations of 45 U.S.C. § 231m(a), railroad retirees, collectively, have been losing millions of dollars each year for at least the past seven years. A failure to grant the injunction will cause further irreparable injury to Plaintiffs.

109.    Because the Board enjoys sovereign immunity from monetary damages, Plaintiffs have suffered irreparable harm and do not have an adequate remedy at law. Because monetary damages are not available, equitable relief is required.

110.    Without an injunction, Plaintiffs will continue to suffer ongoing harm by the Board's breaches of fiduciary duty and violations of 45 U.S.C. § 231m(a). That harm outweighs any damage the injunction might cause the Board.

111.    The requested relief will not disserve the public interest.

112.    Requiring the Board to comply with its fiduciary duties by providing clear and direct communication to retirees about the taxability, or status of taxability, of their Tier II benefits would not be unduly expensive or burdensome. For example, the Board can program a formula to calculate the taxable amount using the Simplified Method as OPM began doing 25 years ago. Additionally, the Board can easily compose and distribute direct communications to retirees to provide them with this information.

**Class Action Allegations**

113.    Plaintiff Logan brings this action under Federal Rule of Civil Procedure 23 on behalf of himself and the following putative class:

All former railroad employees who began receiving Tier II retirement benefits after November 18, 1996, under the Railroad Retirement Act.

114.    While Plaintiff does not know the exact number and identities of the class members, he believes there are at least 200,000 railroad retirees in the class. The class is so numerous that joinder of all class members is not practical.

115.    The exact number of class members and their identities can be ascertained through discovery of the Board's records.

116.    Questions of law and fact common to all class members include, but are not limited to:

(i)     Does the Board have legal authority under the Railroad Retirement Act, the Internal Revenue Code, or any other statute, to collect, withhold, or retain, or to cause the collection, withholding, or retention, of amounts representing the nontaxable portion of Plaintiffs' Tier II benefits?

(ii)    Does the Board owe Plaintiffs a fiduciary duty to ensure they receive their correct benefit amounts and to avoid taking actions that subject them to a tax on their contributions into the Tier II system?

(iii)   Did the Board violate its fiduciary duties arising from the Railroad Retirement Act and/or the fiduciary duties it expressly accepted by failing to clearly and directly communicate to Plaintiffs, on Form RRB-1099-R or otherwise, the taxable amount of the Total Gross Paid or the fact that taxability on such amount had not yet been determined?

(iv)    Did the Board violate, or cause the violation of, 45 U.S.C. § 231m(a) by

failing to clearly and directly communicate to Plaintiffs, on Form RRB-1099-R or otherwise, the taxable amount of the Total Gross Paid or the fact that taxability on such amount had not yet been determined?

117.    Plaintiff Logan's claims are typical of the class's claims. Like the other class members, Plaintiff Logan is a railroad retiree who paid into the Tier II system with after-tax payroll dollars and began receiving benefits under the Railroad Retirement Act after November 18, 1996.

118.    Plaintiff will fairly and adequately protect the class's interests because his interests do not conflict with the class's interests, and he has retained counsel experienced in litigating class actions and complex civil matters.

119.    Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications that would impose incompatible standards of conduct on the Board.

120.    Prosecution of separate actions by individual class members would also create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

121.    The declaratory and injunctive relief sought will provide relief to the entire class because the Board has acted or refused to act on grounds that apply generally to the class.

122.    Common questions of law and fact predominate over questions affecting only individual members; a class action is superior to other available methods for fairly and efficiently adjudicating the class's claims.

123.    Because the potential value of each class member's claims is low relative to the costs of litigation, the burden and expense of individual litigation is prohibitive and prevents class members from individually seeking relief from the Board's actions. On the other hand, management of this action as a class action will be relatively less difficult and provide class-wide relief.

## Requested Relief

Plaintiffs request the following relief from the Court:

a)    A judgment declaring that the Railroad Retirement Board lacks legal authority under the Railroad Retirement Act, the Internal Revenue Code, or any other statute to collect, withhold, or retain, or to cause the collection, withholding, or retention of amounts representing the nontaxable portion of Plaintiffs' Tier II railroad retirement benefits.

b)    A judgment declaring that the Railroad Retirement Board breached its fiduciary duties to Plaintiffs by failing to directly, clearly, or effectively communicate to Plaintiffs the taxable amount of the Total Gross Paid amount or the fact that taxability on the Total Gross Paid amount had not yet been determined.

c)    A judgment declaring that the Railroad Retirement Board violated 45 U.S.C. § 231m(a), or caused the violation of, 45 U.S.C. § 231m(a), by failing to directly,

clearly, or effectively communicate to Plaintiffs the taxable amount of the Total Gross Paid amount or the fact that taxability on the Total Gross Paid amount had not yet been determined.

d)      A judgment declaring that the Railroad Retirement Board breached its fiduciary duties to Plaintiffs by knowingly taking actions that subjected them to an unauthorized tax on their contributions into the Tier II system.

e)      A judgment declaring that the Railroad Retirement Board breached its fiduciary duties to Plaintiffs by using money representing the nontaxable portion of Plaintiffs' Tier II retirement benefits for the Board's own benefit.

f)      Restitution and return of all amounts the Railroad Retirement Board unlawfully collected, withheld, or retained, or caused to be unlawfully collected, withheld, or retained, that represent the nontaxable portions of Plaintiffs' Tier II benefits, plus interest.

g)      A permanent injunction prohibiting the Railroad Retirement Board from collecting, withholding, or retaining, or causing the collection, withholding, or retention of amounts representing the nontaxable portion of Plaintiffs' Tier II benefits.

h)      A permanent injunction requiring the Railroad Retirement Board to directly, clearly, and effectively communicate to Plaintiffs that the Total Gross Paid amount on Form RRB-1099-R is not fully taxable and that further calculations are necessary to determine the taxable amount.

i)      A permanent injunction requiring the Railroad Retirement Board to report to each retiree the taxable amount of his or her Tier II benefits, or to otherwise clearly state on the front of Form RRB-1099-R or through some other direct communication that taxability of the Total Gross Paid amount has not yet been determined.

j)      An award to Plaintiffs for their litigation costs, legal fees, and other penalties allowed by law, including reasonable compensation to the class representative for his time, effort, and risk.

k)      Such other relief as the Court deems equitable and just.

Dated: June 20, 2025                    Respectfully submitted,

*/s/ Charles S. Siegel*
Charles S. Siegel
siegel@waterskraus.com
State Bar No. 18341875
Leslie C. MacLean
lmaclean@waterskraus.com
State Bar No. 00794209
Taryn E. Ourso
tourso@waterskraus.com
State Bar No. 24107315

**WATERS KRAUS PAUL & SIEGEL**
3141 Hood Street, Suite 700
Dallas, Texas 75219
Telephone:      (214) 357-6244
Fax:              (214) 357-7252

*and*

Brant C. Martin

State Bar No. 24002529
brant.martin@wickphillips.com
Colin P. Benton
State Bar No. 24095523
colin.benton@wickphillips.com

**WICK PHILLIPS GOULD & MARTIN, LLP**
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone:     (817) 332-7788
Fax:               (817) 332-7789

*and*

Jeffrey D. Lerner
State Bar No. 12223910
jeff.lerner@thedovefirm.com

**THE DOVE FIRM**
524 E. Lamar Boulevard, Suite 230
Arlington, Texas 76011
Telephone:     (817) 462-0006
Fax:               (817) 462-0027

*and*

John R. (Scotty) MacLean, III
State Bar No. 00787942
smaclean@macleanfirm.com

**MACLEAN LAW FIRM**
4916 Camp Bowie Boulevard, Suite 100
Fort Worth, Texas 76107
Telephone:     (817) 529-1000
Fax:               (817) 698-9401

*Attorneys for Plaintiffs*